IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-01283-PSF-PAC

MARK JORDAN,

        Plaintiff,

v.

MARY H. SOSA,
ROBERT A. HOOD,
OFFICER TUCKER,
ANGELA SHENK,
J.L. NORWOOD,
W.A. SHERROD,

        Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Patricia A. Coan, United States Magistrate Judge

        This is a prisoner civil rights action.  Plaintiff is represented by counsel.  The

matters before the court are: Defendants' Partial Motion to Dismiss [filed October 18, 2005]

and Defendants' Motion to Dismiss [filed November 25, 2005].[1]  A September 27, 2005

Order of Reference referred this case to me for pretrial management and to issue

recommendations for rulings on dispositive motions.  The motions are fully briefed[2] and

I have determined that oral argument would not be of material assistance.

---

[1] I note that although defense counsel accepted service on behalf of defendant Robert Hood on January 6, 2006, defendant Hood has never filed a response to the allegations of the complaint.

[2] Counsel entered his appearance on plaintiff's behalf on December 5, 2005, after plaintiff filed his *pro se* response to Defendants' Partial Motion to Dismiss on November 3, 2005.  Counsel responded to defendants' November 25, 2005 Motion to Dismiss on January 10, 2006.

I.

Plaintiff is incarcerated at the Bureau of Prisons' ("BOP") Administrative Maximum

facility in Florence, Colorado.  He challenges the facial constitutionality of the "Ensign

Amendment," originally enacted as part of the Omnibus Consolidated Appropriations Act

of 1997, now codified at 28 U.S.C. §530C(b)(6), under the First Amendment and the Fifth

Amendment Due Process Clause (claims one and two).  The Ensign Amendment states:

> (6) Funds available to the Attorney General for the Federal
> Prison System may be used for –
> . . .
>
> (D) the construction of buildings and facilities for penal and correctional
> institutions (including prison camps), by contract or force
> account, including the payment of United States prisoners for
> their work performed in any such construction; <u>except that no
> funds may be used to distribute or make available to a
> prisoner any commercially published information or material
> that is sexually explicit or features nudity</u>.

(Emphasis supplied)

The BOP has promulgated a regulation that defines the key terms of the Ensign

Amendment.  "Nudity" means "a pictorial depiction where genitalia or female breasts are

exposed." 28 C.F.R. §540.72(b)(2).  "Features" means that "the publication contains

depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes

itself based upon such depictions in the case of individual one-time issues."  28 C.F.R.

§540.72(b)(3).  Publications containing nudity illustrative of medical, educational, or

anthropological content are excluded.  *Id.*  "Sexually explicit" means "a pictorial depiction

of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation."

28 C.F.R. §540.72(b)(4).  The regulation directs the Warden or his designee to reject

2

"commercially published information or material that is sexually explicit or features nudity" and to return the information or material to the publisher or sender.  28 C.F.R. §540.72(a) and (b).  Plaintiff challenges the constitutionality of the regulation's restriction on incoming publications containing sexually explicit material or featuring nudity (claim three).

Finally, in claims four through eleven, plaintiff asserts that defendants' application of the statute and implementing regulation to deny him access to eight specific publications violated his First Amendment rights.  Plaintiff challenges the rejections of the publications pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §702.

Plaintiff seeks declaratory and injunctive relief.[3]

It appears that plaintiff has exhausted his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. §1997e(a).  (*See* attachments to Complaint)

II.

Defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted.[4]  On a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must accept as true well-pleaded factual allegations. *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir.1995).  All reasonable inferences must be resolved in plaintiff's favor.  *Bauchman v. West High School*, 132 F.3d 542, 550 (10th Cir. 1997)(internal citations omitted).  Dismissal is appropriate only if "it appears beyond a doubt that the plaintiff can prove no

[3]Plaintiff's claims for damages against the individual defendants in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), were dismissed on April 11, 2006.

[4]Defendants also argue that the court lacks subject matter jurisdiction over plaintiff's claims for damages against the defendants in their official capacities.  However, plaintiff has advised the court that he is not seeking damages against the defendants in their official capacities, so the defendants' argument is moot.  *See* Response to Defendant's Partial Motion to Dismiss, at 3.

set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see, also, Ramirez v. Dep't of* Corrections, 222 F.3d 1238, 1240 (10th Cir. 2000).

III.

A.   Facial Validity of the Ensign Amendment and the Implementing Regulation

Inmates retain their First Amendment right to receive information and ideas while in prison. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). The First Amendment protects sexual expression "which is indecent but not obscene."[5] *Reno v. American Civil Liberties Union*, 521 U.S. 844, 874 (1997)(internal quotation and citation omitted). Prisoners also have a liberty interest protected by substantive due process in uncensored communications. See *Procunier v. Martinez*, 416 U.S. at 417-18, over-ruled in part, on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401 (1989). However, a prisoner's exercise of constitutional rights is necessarily limited "both from the fact of incarceration and from valid penological objectives–including deterrence of crime, rehabilitation of prisoners, and institutional security." *Pell*, 417 U.S. at 822-23; *see, also, Cruz v. Beto*, 405 U.S. 319 (1972); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129 (1977)*; Bell v. Wolfish*, 441 U.S. 520, 545-46 (1979); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). Accordingly, prison regulations which impinge on an inmate's constitutional rights are valid if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see, also, Thornburgh*, 490 U.S. at

---

[5]Inmates have no right to receive materials that constitute obscenity. *Miller v. California*, 413 U.S. 15, 23 (1973) ("[O]bscene material is unprotected under the First Amendment.")

414-419 (holding that prison regulations that impose restrictions on incoming mail, including publications, are constitutional if they are reasonably related to legitimate penological purposes).

In *Turner*, the Supreme Court identified four factors that are relevant to the reasonableness inquiry. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (internal quotation omitted). Second, if alternative means of exercising the constitutional right are available to the inmate, courts should accord prison officials substantial deference in determining the validity of the regulation. *Id.* at 90. A third consideration is the impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources. *Id.* Finally, the existence of "obvious, easy alternatives" that fully accommodate the inmate's rights at de minimis cost to valid penological interests indicates that the prison regulation is not reasonable, but is an "exaggerated response" to prison concerns." *Id.* at 90-91.

Plaintiff claims that the Ensign Amendment and the BOP's implementing regulation violate the First Amendment because they are not reasonably related to a legitimate penological interest, but are an exaggerated response to the asserted rehabilitative interest and sweep more broadly than necessary to achieve the stated interest. Plaintiff also argues that the relationship between the restrictions and rehabilitation are arbitrary and irrational and that the Ensign Amendment and the regulation are unconstitutional content-based restrictions. Plaintiff also claims that the statute and regulation violate the Fifth Amendment Due Process Clause by not allowing for individual determinations about

5

whether the rejection of a particular publication furthers a legitimate penological interest.

Defendants, relying exclusively on the District of Columbia Circuit Court of Appeals' reasoning and holding in *Amatel v. Reno*, 156 F.3d 192, 194-202 (D.C.Cir. 1998), contend that the Ensign Amendment and the BOP's implementing regulation are constitutional under *Turner*.

1.    The *Amatel* Decision

In *Amatel*, the D.C. Circuit Court of Appeals addressed the facial constitutionality of the Ensign Amendment on review of a district court's order granting the government's motion to dismiss a prisoner's First Amendment complaint.  The *Amatel* court concluded, after application of *Turner*, that the Ensign Amendment comported with the Constitution. The D.C. Circuit initially found that the purpose of the Ensign Amendment was to facilitate prisoner rehabilitation, as indicated by the following comments of Representative Ensign:

> Congress should not be fueling the sexual appetites of offenders, especially those who have been convicted of despicable sex offenses against women and children. Magazines that portray and exploit sex acts have no place in the rehabilitative environment of prison, nor should we pay Bureau of Prison staff to distribute them.
>
> The infamous serial killer Ted Bundy, . . . stated before his death his belief that pornographic materials directly contributed to his violent crimes.  While a number of factors determine whether a prisoner will become a law abiding citizen upon release from prison, cutting prisoners off from their sexually explicit magazines will certainly do no harm.

(*Id.* at 196 (quoting 142 Cong. Rec. H8254-03 (daily ed. July 24, 1996), Statement of Representative Ensign)).

The *Amatel* court then found that rehabilitation was a legitimate penological interest

and that Congress "could rationally have seen a connection between pornography and rehabilitative values." 156 F.3d at 198-99.  The court stated:

> [T]he regulations restrict prison consumption of publications that implicitly elevate the value of the viewer's immediate sexual gratification over the values of respect and consideration for others. Common sense tells use that prisoners are more likely to develop the now-missing self-control and respect for others if prevented from poring over pictures that are themselves degrading and disrespectful. Nor can we find irrationality in a congressional fear that pornography may set back rehabilitation in the narrower sense, more directly related to recidivist activity.

*Id.* The *Amatel* court also cited a "significant body of research showing that long-term exposure to pornography, particularly pornography containing scenes of `aggressive sexuality,' can make its (male) audience more aggressive, more tolerant of violence against women, and more susceptible to myths about rape, such as the notion that women can enjoy being raped."  *Id.* at 200 (and scholarly citations therein)  The court also recognized, however, that the academic authority "on the other side [was] at least as substantial, and quite possibly more so."  *Id.* The *Amatel* court concluded that the existence of an academic disagreement about the long-term effects of pornography on prisoner rehabilitation was sufficient to show the reasonableness of Congress' judgment in prohibiting the BOP from using federal funds to distribute sexual explicit materials in the prisons.  *Id.* at 200-201.

Considering the remaining *Turner factors,* the *Amatel* court found that the second factor was satisfied because the regulation permitted a broad range of publications to be sent, received and read, including written sexually explicit materials.  *Id.* and n.7.  The D.C. Circuit also resolved the third *Turner* factor in the government's favor because the adverse

impact of accommodating a right to receive sexually explicit materials which may cause aggressive inmate behavior and possibly more incidents of rape and thus pose a threat to the safety of guards and other inmates is substantial. *Id.* at 201.   Finally, under the fourth *Turner* factor, the *Amatel* court concluded that there were no alternatives available to accommodate the prisoners' First Amendment right at de minimis costs to legitimate penological interests. The court found that "[e]ven if pornography could be directed only to those not likely to be adversely affected, it could find its way to others, interfering with their rehabilitation and increasing threats to safety." *Id.*

2.   Application of *Turner* to Plaintiff's Claims

Undoubtedly, rehabilitation is one of the primary and legitimate goals of penal facilities. *See O'Lone v. Estate of Shabazz*, 482 U.S. at  348 (describing rehabilitation as "valid penological objective"); *Procunier v. Martinez*, 416 U.S. at 413 (identifying rehabilitation as a substantial interest of the prison system).  The pertinent question under *Turner*, however, is whether there is a rational relationship between the ban on sexually explicit materials and depictions of frontal nudity imposed by the Ensign Amendment and the BOP's implementing regulation and the rehabilitation of the general inmate population in the federal prison system.  In the Tenth Circuit, prison officials must make at least a minimal showing of a logical connection between the prison regulation and the stated justification for it.  *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002).

The *Amatel* court upheld the Ensign Amendment and the implementing regulation under the first *Turner* factor without any evidentiary support in the record.  Justice Wald, in his dissenting opinion in *Amatel*, emphasized that the studies relied on by the majority

to show a rational relationship between the ban on sexually explicit materials and rehabilitation of prisoners demonstrated only a causative relationship between violent pornography and short-term increases in aggression; none of the scholarly works contained studies showing that viewing nudity or depictions of sexual activities had any effect on prisoners' long-term  rehabilitation. 156 F.3d at 207-08 (citing authorities). Accordingly, while the literature cited by the majority in *Amatel* arguably supports a ban on violent pornography, it does not sustain the broad ban accomplished by the Ensign Amendment and the BOP's implementing regulation.

In contrast to *Amatel*, is *Ramirez v. Pugh*, 379 F.3d 122 (3rd Cir. 2004), where the Third Circuit Court of Appeals  reversed a district court's order granting the government's motion to dismiss a prisoner's complaint challenging the Ensign Amendment and its implementing regulation.  The *Ramirez* court held that the district court erred in dismissing the prisoner's First Amendment claim in the absence of any factual record identifying the specific rehabilitative goals advanced by the government to justify the restriction and evidence to show the rationality of the connection between the restriction and the rehabilitation of the entire population of federal inmates.  *Id.* at 128.

It is evident from Representative Ensign's remarks that Congress was concerned about convicted sex offenders and other violent predators having access to sexually explicit materials in prison.[6]  As the *Ramirez* court noted, there is an obvious connection between the rehabilitative goals of preventing sex crimes and violence against women and

---

[6]In addition to Representative Ensign's statements quoted in the text above, the Congressman also remarked: "[I]f we do not adopt my amendment, we are sending the message that it is OK to provide sexually explicit magazines and books to the very prisoners who have committed violent acts against women." 142 Cong. Rec. H8254-03 (daily ed. July 24, 1996).

a restriction on allowing inmates who have committed such crimes access to sexually explicit pictorial materials. *Id.* at 129; *accord Waterman v. Farmer,* 183 F.3d 208 (3rd Cir. 1999)(upholding constitutionality of state law banning prisoners at sex offender facility from receiving sexually oriented materials because defendants' evidence showed a rational relationship between restriction and rehabilitation of sex offenders; alternatively, court found that logical connection was self-evident).  However, it cannot be said that the relationship between the ban on sexually explicit materials and the rehabilitation of the remainder of the federal inmate population is so obvious that no evidence is necessary to demonstrate its reasonableness.

The lack of any self-evident relationship between a prohibition on sexually explicit materials in the federal prisons and rehabilitative interests is further underscored by the BOP's general regulation pertaining to incoming publications, which has since been modified by the Ensign Amendment and its implementing regulation. The regulation, 28 C.F.R. §540.71(b), states, in pertinent part: "The Warden may reject a publication only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity.  The Warden may not reject a publication solely because its content is . . . sexual." (Emphasis supplied)  Under 28 C.F.R. §540.71(b)(7), a specific publication containing sexually explicit material could be rejected if the material "pose[d] a threat to the security, good order, or discipline of the institution, or facilitate[d] criminal activity."

The BOP, the agency with the expertise in prison management, used to review each publication containing sexually explicit material to determine whether the publication

presented a security or discipline risk to the facility; however, the BOP did not reject sexually explicit publications on the basis of an asserted rehabilitative interest. Accordingly, neither Congress, nor the BOP, can infringe upon prisoners' First Amendment rights by imposing a content-based restriction on publications coming into the prisons under the guise of an undefined rehabilitative interest without offering some evidentiary support to show a logical connection between the two.[7]   Although judicial review under the *Turner* standard is highly deferential, it is not non existent.

The *Ramirez* court, in disagreeing with the reasoning of *Amatel* stated:

> While the obvious end of rehabilitation is the prevention of further lawbreaking once offenders are released from prison, the scope of the interest itself has never been defined by the Supreme Court. [Internal citation omitted] Certainly falling within the legitimate bounds of the interest are prison policies designed to target the specific behavioral patterns that led to a prisoner's incarceration in the first place, or behavioral patterns emerging during incarceration that present a threat of lawbreaking activity other than that for which the prisoner was confined. To say, however, that rehabilitation legitimately includes the promotion of `values,' broadly defined, with no particularized identification of an existing harm towards which the rehabilitative efforts are addressed, would essentially be to acknowledge that prisoners' First Amendment rights are subject to the pleasure of their custodians. [Internal citation omitted]. . .

*Id.* at 128.

Of like import are Justice Wald's cautionary words in his dissenting opinion in *Amatel*:

_____

[7]Prison regulations that restrict inmates' First Amendment rights must operate in a neutral fashion, without regard to the content of the expression. *Turner*, 482 U.S. at 90.  The neutrality requirement is met if the challenged regulation furthers a legitimate penological interest unrelated to the suppression of expression. *Thornburgh*, 490 U.S. at 415.  That question has not yet been answered in this case.

> Unlike its interest in institutional security, the contours of the government's interest in rehabilitation are quite amorphous and ill-defined. . . [I]t should not be possible to proceed on some vague assertion of an interest in `rehabilitation' without the need to define the term or to show a connection between the proscribed activity and the chosen definition; to do so runs an  overwhelming risk of overregulation and invasion of the innermost recesses of the human mind and spirit.  Indeed, undertaking the Herculean task of `character-molding' is inherently problematic in its First Amendment implications, for it presumably involves casting emerging prisoners in society's own image. This, of course, is the antithesis of First Amendment freedoms.

156 F.3d at 210.

I agree with the Third Circuit's reasoning in *Ramirez* and with Justice Wald's dissent in *Amatel* and recommend denying defendants' Rule 12(b)(6) motion to dismiss plaintiff's facial challenges to the constitutionality of the Ensign Amendment and the BOP's implementing regulation because the government has not made an evidentiary showing sufficient to prevail on the first *Turner* factor. *See Beerheide*, 286 F.3d at 1185. The government must describe the specific rehabilitative goal(s) furthered by the restriction on publications containing sexually explicit material and featuring nudity and explain how the stated rehabilitative interest is facilitated by the broad ban.  *See Ramirez,* 379 F.3d at 129.

The government need only show that the relationship between the restriction and the stated rehabilitation goal is not "so remote as to render [it] arbitrary or irrational." *Turner*, 482 U.S. at 89-90.

Because defendants have not been persuasive on the first *Turner* factor, I need not evaluate the other three *Turner* factors at this time.  See *Shaw v. Murphy*, 532 U.S. 223, 229 (2001)(recognizing that government's failure to prevail on the first *Turner* factor is

dispositive, "irrespective of whether the other factors tilt in its favor")(citing *Turner,* 482

U.S. at 89-90).  Notwithstanding, the third and fourth *Turner* factors cannot be considered

adequately in the absence of an evidentiary record.  *See Ramirez*, 379 F.3d at 130-31.

B.      Motion to Dismiss Claims Four through Eleven

Plaintiff asserts in claims four through eleven that defendants violated his First

Amendment rights when they applied the Ensign Amendment and the BOP's implementing

regulation to reject various publications and books sent to him.  Plaintiff sues the individual

defendants in their official capacities for declaratory and injunctive relief.

Defendants argue that claims four through eleven should be dismissed because

plaintiff admits in his complaint that the rejected books and publications contained sexually

explicit material or featured nudity, as those terms are defined by the BOP's implementing

regulation.

As an initial matter, the court must determine the facial constitutionality of the

Ensign Amendment and the BOP's implementing regulation before it can assess the merits

of plaintiff's "as applied" constitutional challenges.

Defendants also contend that claim four is barred by the two-year statute of

limitations applicable to *Bivens* actions.  *See Industrial Contractors v. United States Bureau*

*of Reclamation*, 15 F.3d 963, 968 (10th Cir. 1994).

Plaintiff alleges in claim four that on February 26, 2003, defendant Sosa rejected

the book "Divas and Lovers" pursuant to 28 C.F.R. §540.72 on the ground that every page

in the book contained sexually explicit material or featured nudity.  (Compl., p. 16, at ¶52)

Defendant Hood denied plaintiff's administrative remedy request on March 31, 2003.  (*Id.*,

at ¶56)  Plaintiff instituted this action on June 27, 2005, more than two years later.

I decline to recommend dismissal of claim four as time-barred.  Plaintiff's *Bivens* claims are no longer at issue.  The statute of limitations applicable to a *Bivens* action for monetary relief does not govern plaintiff's requests for declaratory and injunctive relief against the defendants in their official capacities.

Plaintiff has also asserted the APA, 5 U.S.C. §702, as a jurisdictional basis for claims four through eleven.  (Compl., at 3)  If plaintiff's claims are reviewable under the APA,[8] the six year limitations period found in 28 U.S.C. §2401(a) applies. *See Nagahi v. Internal Revenue Service*, 219 F.3d 1166, 1171 (10th Cir. 2000)(internal citations omitted).  I thus recommend that defendants' motion to dismiss  claim four as barred by the applicable statute of limitations be denied.

IV.

For the reasons set forth above, it is

**RECOMMENDED** that Defendants' Partial Motion to Dismiss [filed October 18, 2005] be **DENIED**.  It is

**FURTHER RECOMMENDED** that Defendants' Motion to Dismiss [filed November 25, 2005] be **DENIED** as follows: the motion to dismiss claim four as time barred should

---

[8]Plaintiff's claims against the individual defendants in their official capacities are construed as claims against the United States.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *see*, *also*, *Kyler v. Everson*, 442 F.3d 1251, 1252-53 (10th Cir. 2006)(citing *Hawaii v. Gordon,* 373 U.S. 57, 58 (1963))(holding that United States' sovereign immunity extends to agents and officers of the United States when acts complained of were undertaken in their official capacities).  The APA waives the United States' sovereign immunity for judicial review of final agency action in specified circumstances. *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 549 (10th Cir. 2001); 5 U.S.C. §702, §704.  The federal courts are empowered to hold unlawful and set aside agency action, findings and conclusions that are "contrary to constitutional right."  5 U.S.C. §706(2)(B).

be **DENIED WITH PREJUDICE**; the motion to dismiss plaintiff's "as applied" constitutional challenges to claims four through eleven should be **DENIED WITHOUT PREJUDICE.**

**Within ten days after being served with a copy of the proposed findings and recommendation, any party may serve and file written objections to the proposed findings and recommendation with the Clerk of the United States District Court for the District of Colorado.  The district judge shall make a de novo determination of those portions of the proposed findings or specified recommendation to which objection is made.  The district judge may accept, reject, or modify, in whole or in part, the proposed findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.**

**Failure to make timely objections to the magistrate judge's recommendation may result in a waiver of de novo review of the recommendation by the district judge and may also waive the right to appeal from a judgment of the district court based on the findings and recommendations of the magistrate judge.**

Dated June 21, 2006.

BY THE COURT:

s/ Patricia A. Coan
PATRICIA A. COAN
United States Magistrate Judge